## LOLA ALFIL HOLTER, ETC. v. AGNES LAUGEN AND OTHERS.[1]

November 9, 1923.

No. 23,570.

**Finding that plaintiff was not promised property sustained.**

1. Evidence considered, and *held* to show that the trial court's refusal to find that plaintiff had been given to others under a verbal contract to adopt and as a part of such contract that she should receive, upon the death of the adopting parents, all their property, is not manifestly and palpably contrary to the evidence.

**Character of proof required to establish verbal agreement to adopt.**

2. Proof necessary to establish verbal agreements of this character must be clear, positive and convincing; and relief should be cautiously granted.

Action in the district court for Fillmore county to enforce specific performance of a verbal contract. The case was tried before Meighen, J., who made findings and dismissed the action on its merits. From an order denying her motion to amend the findings and conclusions or for a new trial, Peterson, J., plaintiff appealed. Affirmed.

*Hopp & Larson*, for appellant.

*D. S. Prinzinc* and *Tawney, Smith & Tawney* and *E. D. Libera*, for respondents.

[1]Reported in 195 N. W. 639.

WILSON, C. J.

This action is brought by Lola Alfil Holter, a minor, by her guardian, seeking specific performance of an alleged verbal contract made in her behalf by her father with Christ Holter and Carrie Holter, husband and wife. It is claimed that the minor was 13 years old at the time this action was started and that the contract was made in March, 1912, in which it is claimed that the father gave the child to the Holters in consideration of their agreeing to adopt her and make her their child, and further agreeing that the child should receive their entire estate, both real and personal, upon their death. The answer puts in issue the second element of this alleged contract. The plaintiff went into the Holter home, in March, 1912, and she was duly adopted by them in November, 1914. Christ Holter died testate June 20, 1918, leaving all his property to his wife, and Carrie Holter died testate in March, 1921, leaving an estate of about $7,000, and gave the plaintiff but $300 thereof and gave the balance to others.

At about the time plaintiff's father placed her in the Holter home he placed two other children with an orphanage known as The United Norwegian Lutheran Church of America under a written contract. This followed the death of plaintiff's mother, leaving 9 children, and apparently the father was doing the best he could, under his unfortunate circumstances, to care for his children.

The principal witnesses in behalf of plaintiff were of Norwegian birth and not fluent in our language. Plaintiff's father required an interpreter to give his testimony.

After the trial of this case the term of office of the trial judge terminated and an alternative motion for amended findings or a new trial was submitted to his successor in office, who declined to pass upon the motion for amended findings, but did entertain, consider and deny the motion for a new trial. In exercising his discretion on the motion for a new trial, he necessarily passed upon the sufficiency of the evidence to justify the conclusions of the trial court, and upon the appeal from the order of the trial court denying the motion for a new trial, which brings this case to this court, appellant raises all the questions that could have been raised if the

succeeding judge had passed upon the motion for amended findings.

After considering the record we do not find any error in the admission of the evidence.

The important question in this case is as to whether the findings of fact and conclusion of law of the trial court are sustained by the evidence.

Plaintiff's father testified that Holter said he couldn't do better than give them the girl because they had plenty to take care of her; that he told Holter it would have to be on a certain bargain and he said: "I said that it has got to be on certain conditions and contingency, that if you take one of my children, you must be good to her and give her all that you have got," and Holter said: "That was all right * * * that if they could get one of my children, that she should have all that was left from us" · * * * "that they could get the child on those conditions, that they would be good to her and that she would get all that was left * * * they wanted it no other way * * * There was nothing else said than they were to take the girl, adopt the girl, keep her as their own, and all the property that was left after they were through with it was to go to her." "That is all that was talked about."

Plaintiff's sister testified that her father required Holter to agree "that everything that was left, that she (plaintiff) was going to have." "Mrs. Holter said they didn't expect to get the kid any other way" and that her father had said to them: "If they promised if she was the one to have everything that was left they could have her that way" and she says Mrs. Holter said: "That was all right if she overlived them." She testified on cross-examination that they were to take the child so it would be theirs the same as if born in their family and that that was the only agreement, "but have the right to all there [was] left after they died, all the property and money that was left after they died." Another witness testified that Mrs. Holter once told plaintiff: "You know you are going to get everything I have, all the things after me."

This substantially discloses the evidence in the case, and, in considering the conclusions of the trial court, we must not overlook the fact that it was the claim of the defendants that the agreement

extended only to the adoption and that the child should become the same as if it was Holter's own child. This contention gives great opportunity, from this record, of the danger of these parties misunderstanding each other, or of the adopting parents not intending to do what the opposing parties now claim for the transaction.

The trial court might well have found the other way, but he found as he did. He is a man of judicial ability and of sound discretion. It is obvious that he fully appreciated his responsibility in the matter. This court is not the trier of fact. We peruse the facts to ascertain if there is evidence to support the findings of the trial court, but when we reach that point our prerogative ceases.

The trial court evidently fully appreciated that cases of this character are inherently easy to prove and hard to combat—a characteristic that should not impair the action when proved, but it should cause the court to proceed with caution. He saw the great opportunity of the parties misconstruing language that might have been intended as claimed by the plaintiff or that might have been intended as claimed by the defendants. He saw the probable inability of the witness, August Hanson, to distinguish in his own mind the legal difference between two certain answers which he made—one favorable to the plaintiff and the other favorable to defendants. He had the benefit of seeing and hearing the witnesses. He saw the uncertainty as to whether the minds of these contracting parties ever met upon any agreement beyond the legal adoption of the plaintiff. Doubtless at that time all the parties might have supposed that the consequence of the adoption would result in the plaintiff inheriting the property of her foster parents if she survived them. This would usually result. It is the claim of the plaintiff that she was to be given rights superior to the rights of a natural born child. This is extraordinary in view of the fact that the adopting parents had never seen her before the day of making the contract. They were strangers to each other with no special affection or attachment to draw them together. The Holters never in any way recognized the contract as claimed by the plaintiff by letter or by words spoken from time to time to disinterested parties. Having legally adopted the child, it would be consistent with the

claims of the defendants for the Holters to have made the statements attributed to them, subsequent to the original talk. It is important also to observe that plaintiff's father was placing two other children in the hands of others about the same time upon much less favorable terms than he claims surrounded this transaction.

The evidence in cases of this character must be clear, positive and convincing, and the relief in cases of this kind should be cautiously granted. Fiske v. Lawton, 124 Minn. 85, 144 N. W. 455. The learned trial court having decided that the proof was insufficient, we are required to, and do, hold that the evidence is not manifestly and palpably in favor of the plaintiff (Weiss v. Peterson, 124 Minn. 84, 144 N. W. 450; Wilson v. Wilson, 151 Minn. 72, 186 N. W. 126), and hence the order of the trial court must stand.

Order affirmed.