# MAX ALSDORF, ALSO KNOWN AS MAX ALLSDORF, v. LESLIE SVOBODA, ADMINISTRATOR OF ESTATE OF JOHN SOBOLL, AND OTHERS.[1]

March 20, 1953.

No. 35,855.

---

[1]Reported in 57 N. W. (2d) 824.

2

*Edman & Edman,* for appellant Leslie Svoboda.
*Seifert & Johnson,* for appellant Paul Soboll.
*Guy E. McCune,* for appellant Mary Walter.
*Dougherty & Flynn,* for respondent.

DELL, JUSTICE.

This is an appeal from an order of the district court of Martin county denying defendants' alternative motion for amended findings or a new trial.

The action is to obtain specific performance of an oral contract which plaintiff asserts he made with the decedent, John Soboll. Under the terms of the contract plaintiff claims that the decedent agreed for a valuable consideration that at his death he would leave and give to the plaintiff all of his property. The trial was to the court. Findings were made for the plaintiff, and the court directed the entry of judgment for specific performance of the contract.

The appeal raises three issues for consideration here: (1) Did the plaintiff prove the existence of the contract by clear, positive, and convincing evidence? (2) Was there sufficient performance of the contract to take it out of the operation of the statute of frauds? (3) Were the services rendered by plaintiff of such a character that adequate pecuniary compensation therefor could not be made?

At the outset we are confronted with the following well-established principles of law laid down by this court: (1) Whether the contract was made is primarily a question of fact to be determined by the trial court in the light of the evidence presented and the surrounding circumstances. Seitz v. Sitze, 215 Minn. 452, 10 N. W. (2d) 426. (2) If there is evidence to sustain the trial court's findings, we are compelled to affirm unless the findings are manifestly and palpably contrary to the evidence. In re Estate of LeBorius, 224 Minn. 203, 28 N. W. (2d) 157; Shaughnessy v. Eidsmo, 222 Minn. 141, 23 N. W. (2d) 362, 166 A. L. R. 435; Seitz v. Sitze, supra; Holter v. Laugen, 157 Minn. 90, 195 N. W. 639. (3) A party may bind himself by contract to make a testamentary disposition of his property. That the contract is oral does not prevent specific performance if the usual conditions relating to specific performance obtain. The contract must be proved by clear, positive, and convincing evidence. In re Estate of LeBorius, supra; Jannetta v. Jannetta, 205 Minn. 266, 285 N. W. 619. (4) Specific performance of a contract may be refused if the consideration is grossly inadequate, its terms are unfair, its enforcement will cause unreasonable or disproportionate hardship or loss to the defendant or to third persons, or it was induced by some sharp practice, misrepre-

sentation, or mistake. Goette v. Howe, 232 Minn. 168, 44 N. W. (2d) 734; Matheson v. Gullickson, 222 Minn. 369, 24 N. W. (2d) 704.

Plaintiff was born in Germany in 1913. In 1928 at the age of 15, as the result of a letter written to his parents by decedent's wife, plaintiff's aunt, he left Germany and came to live with the decedent and his wife on their farm near Ceylon, Minnesota. He attended school until he was 16 and during that time did the chores on decedent's farm. After leaving school he performed the usual farm work incident to the operation of a 160-acre farm. From 1930 to 1938 he did practically all of the farm work alone; there was no hired help. He was paid no wages but received his board and room. During the summer months of at least some of those years, he received varying amounts from $20 to $30 a month.

By 1938 plaintiff had saved $300. He used this to purchase farm machinery from the decedent. From then on until decedent's death, plaintiff and decedent operated the farm together. Plaintiff did all of the farm work. Plaintiff owned the farm machinery and horses. Together they owned the hogs, cattle, and chickens in equal shares. The income was divided equally between them.

Mrs. Soboll died in 1940 and from then until plaintiff's marriage in 1943 plaintiff and decedent "batched" together on the farm. During that period plaintiff did most of the housework, cooking, washing, canning, and similar tasks. He advised with the decedent and assisted him in his personal affairs. He rendered intimate companionship to him, visited with him using the German language, took him to town whenever the decedent desired, and gave him painstaking personal care and attention. On Christmas they exchanged gifts. They spent their holidays and Sundays together and on those days usually ate their meals in town. They were devoted to each other, and the relationship between them was similar to that of father and son.

In February 1943, plaintiff was married. This met with the wholehearted approval of the decedent. In fact the decedent urged the plaintiff to marry. On the day of the marriage plaintiff returned to the farm with his wife. They were presented with a wed-

ding present by the decedent, and the next day he gave a wedding party for them and displayed great pleasure and satisfaction in their marriage. Children were born as a result of the marriage, and from then until decedent's death plaintiff, his wife, children, and decedent lived together as one happy family on the farm. Decedent had the full run of the house, and plaintiff's entire family was solicitous of his welfare. Decedent considered himself retired. Plaintiff continued to perform all the work on the farm, without the assistance of a hired man, right up to the time of decedent's death.

Decedent drank intoxicating liquors to excess. This was the only unfortunate part of their family life. He would become intoxicated as frequently as two, three, and sometimes four times a week. When sober, he was kind, agreeable, considerate, and pleasant. When intoxicated, he was loud, boisterous, unreasonable, and exceedingly difficult to handle. On occasions, while under the influence of liquor, he would bring whiskey home with him and drink throughout the night. On those occasions he would walk the floor, pound on the table, talk to himself, swear, and prevent plaintiff and his family from getting their rest. When he was so intoxicated, his habits were filthy. They need not be detailed. It is sufficient to say that cleaning his bedding, washing his clothes, and cleaning the house after him were most disagreeable and taxed plaintiff and his wife to the limits of their patience. Notwithstanding, they continued their devotion toward him.

During the later years of his life, decedent was not well. When confined to his bed, he was given excellent care and devotional attention by both plaintiff and his wife. When necessary plaintiff took him to Estherville, Fairmont, and Ceylon for medical attention. Two days prior to decedent's death plaintiff took him to the hospital. It was a sad parting; tears were shed. Upon decedent's death, plaintiff made all arrangements for his burial. Throughout all the years plaintiff conducted himself in the manner of a dutiful son. He did this to the last.

There was no close association between the decedent and any of his relatives, the defendants. The defendant, Mary Walter, had not visited with or contacted him for several years. She did not attend his funeral.

In 1942 the decedent executed what he supposed was his last will and testament. Since it was not witnessed or attested it was not a valid will and could not be offered for probate. The instrument was as follows:

"I, John Soboll of Tenhassen Township on the County of Martin and State of Minnesota being of sound mind and memory, do make, publish and declare this to be my Last Will and Testament.

"First I order and direct that my Executor hereinafet [sic] named, pay all of my just debts and funeral expense as soon after my decease as conveniently may be.

"Second after the payment of such funeral expenses and debts I give devise and bequeath unto Max Allsdorf all of my property both real and personal of every kind name nature and description wherever may be upon the express condition that the said Max Allsdorf make a good and sufficient home for me during my lifetime and take good and sufficient care of me during any sickness that I may have during my lifetime.

"Third, I hereby reserve the right to change this my last Will and Testament at any time I have reason to believe that the said Max Allsdorf is not doing as I deem adviseable.

"Dated at Ceylon Minnesota This 7th day of July 1942.
"/s/ JOHN SOBOL."

In about August 1942, decedent showed the will to Charles E. Champine, the cashier of the state bank of Ceylon. He told Champine that if plaintiff gave him a good home he was to have everything that decedent owned. Decedent then placed the will in his safety deposit box in the bank where it remained until his death. Champine testified "Well, John [decedent] had told me at various times, when we talked, that everything he had went to Max [plaintiff] upon his death providing he gave him a home." During December 1947,

plaintiff and decedent entered the bank together. As to what transpired Mr. Champine testified as follows:

"A. John and Max came into the bank that day, sometime in December, 1947, and Ed Vollrath was standing there close at that time. And John says, 'Charley, Max and I have agreed that, if he will make a good home for me during my lifetime, he shall have all of my property after I am dead'. And Max says, 'Yes, that's right, but', he says, 'that should be in writing'. John says, 'I have got that in writing'. He said, 'Get my box'. I got his safety deposit box for him and gave it to him. He took this document out of it, handed it to Max, and he says, 'Read that'. Max read this all over, and he says, 'Yes', and he handed it back to John. John handed it to me, and he says, 'Charley', he says, 'Don't that give Max everything I have after I am dead, if he gives me a home during my life?' I looked at it and says, 'Why, John, as far as I know, it does'. And then I gave this back to John again."

Under further questioning Mr. Champine testified:

"Q. Then, after, Mr. Champine, after you had read the document and you handed it back to Mr. Soboll, then what did John Soboll do or say?

"A. Well, he put this document—

*     *     *     *     *

"A. (continued)—back in the box, and he says, 'There, Max, you see now that I am giving you everything that I have got after I am dead if you give me a good home during my life'."

Not only was this testimony uncontradicted and unimpeached but it was corroborated by the testimony of Mr. Vollrath, who was then the assistant cashier of the bank. Mr. Vollrath's testimony was also uncontradicted and unimpeached.

Henry Viesselman, a buttermaker and friend of decedent's, testified that in May or June 1949 decedent told him:

"A. And he said he had been doctoring and it hadn't been helping him, and he said he didn't think he would be here long. And I

asked John if he had everything in order just in case something would happen. And he says, 'Yes, I have'. He says, 'Away back in 1941 I agreed with Max Alsdorf that, when I died or passed away, everything I got goes to Max'.

\* \* \* \* \*

"A. John said, 'There will not be any trouble. Max knows that. We have agreed, away back in 1941 we have agreed, if Max gives me a home as long as I live, he will get everything I have'."

Eight other disinterested witnesses, friends of the decedent, testified to conversations which they had with the decedent in which they were told of the arrangement that plaintiff was to have decedent's property upon his death. Their testimony was uncontradicted and unimpeached.

Defendants called but two witnesses, neither of whom contradicted or refuted the testimony above related. They testified only as to the wages of farm hands during the years from 1930 to 1936.

■ The contract here being oral is within the statute of frauds (M. S. A. 513.04). As such it is void unless removed from the effects of the statute by sufficient part performance of the kind and character entitling plaintiff to specific performance. Matheson v. Gullickson, 222 Minn. 369, 24 N. W. (2d) 704, *supra;* Goette v. Howe, 232 Minn. 168, 44 N. W. (2d) 734, *supra;* 6 Dunnell, Dig. & Supp. § 10207.

■ Ordinarily specific performance of a contract relating to personal property will not be granted. If, however, the contract includes both real and personal property, the jurisdiction of the court to grant specific performance as to the real estate carries with it the right to grant specific performance of the contract as a whole, including the provision relating to the personal property. Goette v. Howe, *supra;* Herman v. Kelehan, 212 Minn. 349, 3 N. W. (2d) 587.

■ We must therefore address ourselves to the question of whether there was sufficient part performance of the contract of the kind and character entitling plaintiff to its specific performance.

It is well settled by the decisions of this court that specific performance of an oral contract to devise land will be granted where the promisee and promisor, pursuant to such contract, are living together as members of a household and the promisee, under the contract, has assumed a peculiarly personal and domestic relationship toward the promisor and has given to him the society and services incident to such relationship and of a kind and character, the value of which cannot be measured in money. Where the services are not of such peculiar character and can be reasonably compensated for in money, the rule is otherwise. Matheson v. Gullickson, *supra;* Goette v. Howe, *supra;* 6 Dunnell, Dig. & Supp. § 10207.

Under these principles we hold that the services of the plaintiff were of a kind and character justifying specific performance. Here plaintiff, as a member of the household, gave filial devotion and companionship to the decedent. He stood in the position of a dutiful son. He advised the decedent in his personal affairs. He visited with him in German, the decedent's native tongue. He took him on trips, spent his holidays with him, married as decedent urged, and gave him an excellent home. He was solicitous of decedent's welfare, cared for him in sickness and in health, and performed the most disagreeable tasks for him on the numerous occasions when the decedent was in a state of intoxication. Whatever services were necessary for the comfort and convenience of the decedent were freely and readily given. These services were of such a peculiar kind and character that their value cannot be measured in money. No inequities exist as a basis for refusing specific performance. The consideration for the contract was adequate and its terms fair. Its enforcement will not cause unreasonable or disproportionate hardship or loss to anyone, including the defendants. On the contrary, its enforcement will result in substantial justice being done.

The complaint alleged that the contract was made between plaintiff and decedent in 1928. During the course of the trial, the court permitted plaintiff to amend his complaint so as to allege that the contract was made in 1941. It is not claimed upon this appeal that the court erred in permitting the amendment, but it is claimed that

for plaintiff first to allege that the contract was made in 1928 and to later amend, alleging that it was made in 1941, so discredited plaintiff's claim as to require a holding that plaintiff had not established his cause of action by clear, positive, and convincing evidence.

We think that defendants misconceived the purpose of the amendment. The record shows that prior to the amendment plaintiff's counsel, in the discussion between the court and all counsel, claimed that the contract had its inception in 1928 and that what transpired thereafter was a reaffirmation of the 1928 contract. The statute barring conversations with a party since deceased of course prevented plaintiff from relating any conversations with the decedent as to the contract. The amendment came after plaintiff's counsel was being pressed for an election as to "what he is going to depend on in this lawsuit." We think the fair inference to be drawn from what transpired is that the amendment was made, not because plaintiff was abandoning the claim that there was a contract having its inception in 1928, but because plaintiff was confronted with the uncertainty of proof as to the 1928 agreement. The fair inference is that he made the amendment to the year 1941 because he could furnish adequate proof of the making and existence of the contract sued upon as of that year. We find nothing in the amendment that casts discredit upon the plaintiff's cause of action.

■ Defendants complain because the court did not make more detailed findings concerning the terms of the contract between the plaintiff and the decedent alleged in the complaint. The court might well have gone into greater detail. However, the ultimate facts establishing plaintiff's right to recover were found by the court. That, on the record here, is sufficient. Hayes v. Hayes, 119 Minn. 1, 137 N. W. 162; Sheehan v. First Nat. Bank, 163 Minn. 294, 204 N. W. 38; 6 Dunnell, Dig. & Supp. § 9851. Where, on appeal, it appears that the issues have been decided, we are not required to reverse simply because the decision below might well have gone into greater detail. Here it is clear that the necessary fact issues have been determined; that is sufficient. There are occasions when more detailed findings are required; this is not such a case. Mienes v.

Lucker Sales Co. 188 Minn. 162, 246 N. W. 667; Martens v. Martens, 211 Minn. 369, 1 N. W. (2d) 356.

■ Moreover, defendants moved to strike the findings made by the court and to substitute findings in their place, which motion, if granted, would have established that the claims of the plaintiff as alleged in the complaint were untrue. The motion for amended findings was denied. Where the court denies a motion for amended findings of fact, that is equivalent to making findings negativing the facts asked to be found. Sheffield v. Clifford, 186 Minn. 300, 243 N. W. 129; Smith v. Benefit Assn. of Ry. Employees, 187 Minn. 202, 244 N. W. 817; Martens v. Martens, *supra*.

■ Upon the evidence the court found that in the year 1941 the decedent and the plaintiff entered into an oral agreement whereby decedent agreed that, if plaintiff would make a good home for the decedent during his lifetime, upon his death he would leave and give to plaintiff all of his property. It further found that the plaintiff, from and after the making of the agreement, furnished the decedent with a good home and cared for him as long as he lived and fully and completely performed his part of the agreement. It found that the evidence, in proof of the contract, was clear, satisfactory, convincing, and conclusive and that the services rendered by the plaintiff in fulfillment of the contract were of such a peculiar character that adequate pecuniary compensation therefor could not be made. These findings were amply justified by the evidence and the order appealed from must be affirmed.

This case presents another illustration of the unfortunate difficulties that arise where legal business is entrusted to laymen rather than to lawyers. Had the instrument which decedent clearly intended as his will been witnessed and attested as required by statute, it could have been probated and a costly trial and appeal to this court would have been avoided.

Affirmed.