ASSOCIATED LITHOGRAPHERS,
Respondent,

v.

STAY WOOD PRODUCTS, INC., et al.,
defendants and third party
plaintiffs, Appellants,

v.

David H. AFFELDT, third party
defendant, Respondent.

No. 48366.

Supreme Court of Minnesota.

March 30, 1979.

Stuart E. Gale, Bloomington, for appellants.

Herbert C. Davis, St. Louis Park, for plaintiff-respondent.

Charles Rubenstein, Minneapolis, for defendant-respondent.

Heard before OTIS, PETERSON, and KENNEDY, JJ., and considered and decided by the court en banc.

CHARLES W. KENNEDY, Justice.*

Stay Wood Products, Inc., and N. T. Slade appeal from a judgment in favor of respondent, Associated Lithographers, for $2,630.09, the reasonable value of printing performed. Trial was to the court without a jury. We affirm as to Stay Wood Products, Inc., and reverse as to N. T. Slade.

Stay Wood Products, Inc. (the corporation), also known as Stay Wood Products,

---

* Acting as Justice of the Supreme Court by appointment pursuant to Minn.Const. art. 6, § 2, and Minn.St. 2.724, subd. 2.

and as Staywood Products, was owned by N. T. Slade, its president, and Robert H. Taylor. It manufactured waterbed frames and related furniture at Airlake Industrial Park, 21405 Hamburg Avenue, Lakeville, Minnesota, which was the business address of the corporation, of N. T. Slade, David H. Affeldt, and every Stay Wood and Staywood venture referred to herein.

In the spring of 1975, Slade, for the corporation, and his business associate Affeldt agreed to form a venture known as Staywood Sales Company, composed of the corporation and Affeldt, to handle sales of the waterbed frames and related furniture. Slade permitted Affeldt to have his office with that of the corporation, use its telephone, share secretarial help, have access to financial statements of the corporation and of Slade, and carry a business card identifying him as executive sales manager of the corporation. Slade and Affeldt decided that a brochure would be prepared and printed to promote sales. Gorlyn A. (Doc) Oldre, the general manager of the corporation, Affeldt, and Slade worked with Thomas F. Olejnicak, a representative of Art Enterprises, in preparing the art work for the brochure. When the art work had been approved by Slade, Olejnicak suggested that respondent do the printing. Slade told him, "[Y]es * * * go ahead and appropriate the printer." James E. Meyer, a salesman for respondent, was contacted by Olejnicak. Meyer submitted proofs for the proposed brochure after meeting with Oldre and Affeldt at various times and after telephone talks with Affeldt, who was reached at the telephone number of the corporation. Slade took part in preparation of some of the language and some of the illustrations for the brochure. He knew what the bro-

chure contained[1] and that respondent was to do the printing. Slade gave no instructions to respondent about payment or credit.

When the participants had agreed on the form and design of the brochure, Affeldt told respondent to print it, along with other materials—letterheads, envelopes, etc. As was its practice, respondent wrote to the corporation, acknowledging the order, saying, "Our credit policy requires that the attached credit application be completed before we proceed" and enclosed a credit application. The application came into the hands of the general manager, Oldre, who turned it over to Affeldt. Affeldt completed the credit application form with information he had learned from Slade or from sources made accessible to him by Slade. The credit application was returned to respondent in due course. It listed the name of the organization applying for credit as "Staywood Products Inc." and furnished credit references. It was signed by Affeldt as "Ex V. Pres." Respondent checked the references, learned that credit of the corporation was satisfactory, and proceeded to print Staywood Incorporated brochures, business cards, letterheads and envelopes, and Staywood Sales Co. envelopes, letterheads, invoices, and order forms, and to prepare an etching and rubber stamp.

Respondent performed the printing between May 2, 1975, and June 11, 1975, delivering all of the materials to the corporation's office. Slade knew that they had been delivered. Some of the materials were used; none were returned. Billings to the corporation produced no response until October 1975, when Slade denied that the corporation was liable for the printing expense.[2]

---

1. Thus, Slade knew that the brochure purported to be issued by Staywood Incorporated, which was never formed; that it displayed the building occupied by the corporation, identified as Staywood Products; and that it recited: "STAYWOOD Products Company is a versatile, woodworking, cabinet and furniture making facility" and "STAYWOOD Products is exclusively a manufacturing company. Its water bed products can only be acquired through STAYWOOD Sales Company."

2. In the summer of 1975, respondent's Mr. Wolfe telephoned the corporation about the unpaid bill. Slade testified: "A I believe it was in the summer of '75. I believe that the person identified himself as Mr. Wolfe, that he was calling from Associated Lithographers, and because I thought it was a Staywood Sales Company matter I said the person who was involved was not here.

■ 1. Appellants contend that the corporation is not liable because Slade did not personally approve the order. It is claimed that Olejnicak, who did the art work, told respondent's salesman, Meyer, that extension of credit to the corporation would have to be approved by Slade. When fully considered, the evidence does not require a finding that Olejnicak gave such an instruction.

The argument focuses on an answer by Olejnicak on cross-examination to a leading question by appellants' counsel: "You told Mr. Meyer there was a third person, namely Tim Slade, that they would have to go to for credit approval; is that right?" Olejnicak answered, "That's correct." In other testimony Olejnicak testified differently:

"Q When did you have the conversation with Mr. Meyer relative to credit approval?

"A At the first meeting with Dave Affeldt, Doc Oldre and myself for final approval on the art work.

\* \* \* \* \* \*

"Q Can you recall exactly what that conversation was?

"A As we do with all our clients, I told Jim that we—we were responsible for the production of the art work only, making sure that the client has approved it to his satisfaction, and that Associated Lithographers would take the printing on, with us stepping out from that point, so that any dealings that they had would be with the manufacturer of the waterbeds.

\* \* \* \* \* \*

"Q \* \* \* Now, I believe your earlier testimony was that you advised them—advised Mr. Meyer that he had to have approval from the manufacturer; is that correct?

"A That is Stay Wood Products Incorporated, yes.

"Q You didn't at any time tell him that Stay Wood Products Incorporated was not responsible?

"A No, I did not."

**3.** It was apparently the arrangement between Affeldt and Slade that the corporation and

"Q And did you at any time advise Mr. Meyer that that would require approval from someone other than Mr. Oldre and Mr. Affeldt?

"A No. At that time I mentioned no names. I introduced the two—the two people representing Stay Wood Products Incorporated, and let them—let the three of them work that out as to who was responsible for getting credit approval."

Originally, the trial court did not make any finding on this specific issue. By motion for amended findings, appellants asked the court to find that Olejnicak told Meyer, and that Meyer knew, that Slade "had to be contacted before accepting a purchase order that would be valid for either Stay Wood Products, Inc. or Slade." The court denied the motion to amend the findings, and the denial "is equivalent to making findings negativing the facts asked to be found." *Alsdorf v. Svoboda,* 239 Minn. 1, 11, 57 N.W.2d 824, 830 (1953). See, also, *Chopp v. Chopp,* 257 Minn. 526, 102 N.W.2d 318 (1960).

When all of Olejnicak's testimony is considered, his version appears to be that he did not give any instruction about Slade's approval but told Meyer that respondent would have to make its own credit arrangements with the manufacturer. Meyer's testimony does not support appellants' contention. He testified that he did not "establish \* \* \* who was directly responsible for purchasing" and that he told his employer's credit department to check out the credit of the corporation.

When the printing order was placed with respondent, the corporation was the only financially responsible entity because Staywood Incorporated was nonexistent, and Staywood Sales Co. depended on the corporation for financial assistance.[3] Slade was

Staywood Sales Company would eventually share the printing costs, but that was not known to respondent. That the corporation was to advance money for the Staywood Sales Company is shown by language in a May 1975 agreement between Staywood Products Company, by Tim Slade, Treasurer, and Staywood

aware of these circumstances. Had he intended that the printing not be charged without his personal approval, it seems likely that he would have informed respondent of that directly.

■ 2. The trial court's finding that Affeldt "had no authority to conduct business with plaintiff in the name of the corporation" is taken to mean actual or implied, rather than apparent, authority. The court ruled that the corporation was liable for the printing which Affeldt had ordered and thus found, in effect, that Affeldt had apparent authority. The court ruled that Affeldt had acted wrongfully and was liable for punitive damages to the corporation and evidently considered a finding of lack of authority necessary for a conclusion that Affeldt was liable.[4] But an agency, by apparent authority, or by estoppel, was necessary for the conclusion that the corporation was liable for the order placed by Affeldt.

It appears as a matter of law that the conduct of the corporation, through Slade, was conduct which caused respondent to reasonably believe that the source of the credit application had authority to order the goods and request the credit. The corporation, through Slade, permitted Affeldt to be active in planning the printing of the brochure and materials with respondent's salesman and to be located and informed so that in the regular course of business he could receive and complete and submit an accurate and effective credit application on which respondent relied. The appearance of authority resulted from conduct of the corporation. From the viewpoint of respondent, Affeldt had apparent authority to charge the printing to the corporation. *Duluth Herald & News Tribune v. Plymouth Optical Co.*, 286 Minn. 495, 176 N.W.2d 552 (1970); *McGee v. Breezy Point Estates*, 283 Minn. 10, 22, 166 N.W.2d 81, 89 (1969)[5]; Restatement, Agency 2d §§ 8, 27; 3 Am. Jur.2d, Agency, § 74.

■ 3. Slade was not sued originally, but during trial, on motion of respondent, the court ordered that Slade be made a party defendant, saying that he could be held liable "as a party that was an individual ordering from the Lithographers as a part of the joint venture of the sales company." The court did not require service or filing of any amended pleading.[6] Slade objected to being made a party, but did not ask for an amended pleading or for additional time, and he invoked the court's jurisdiction by immediately moving for summary judgment in his favor. He now disputes the propriety of the order making him a party defendant. The procedural question need not be pursued because on the findings and the evidence, Slade cannot be held liable. There were no findings that would justify a conclusion that he was liable, and the evidence did not disclose a reason for holding him liable. The issue was simply whether the corporation was liable. Respondent did not claim, or prove, that it had performed the printing for Slade personally, or for any venture in which he was involved, other than the corporation.

Sales Company, by David H. Affeldt, President, which said, in part:

"For amounts paid or to be paid by Staywood Products Company for Staywood Sales Company, Staywood Sales Company will repay Staywood Products Company within 7 days of request for payment.

"Staywood Products Company will bill Staywood Sales Company one week in advance of the date * * * payment is expected.

"Amounts billed under this agreement will, hereafter, be handled as indicated in the basic operating agreements between said companies."

4. The court found that: "The unauthorized extension of credit of the corporation by third party defendant * * * damaged said defendant corporation." It was Slade's claim that Affeldt had "misappropriated Stay Wood Products Inc. credit."

5. "* * * An agent's apparent authority results from statements, conduct, lack of ordinary care, or other manifestations of the principal's consent, whereby third persons are justified in believing that the agent is acting within his authority." *McGee v. Breezy Point Estates*, 283 Minn. 10, 22, 166 N.W.2d 81, 89 (1969).

6. See, 3A Moore, Federal Practice (2 ed.) § 21.05[1]; cf. *Sheehan v. Hall*, 187 Minn. 582, 246 N.W. 353 (1933).

■ 4. The statute of frauds[7] is not a defense because the printed materials were specially manufactured, were not suitable for sale to others, and the buyer gave no notice of repudiation before there had been a substantial beginning of the printing.[8] See, *Burger Man, Inc. v. Jordan Paper Products, Inc.*, Ind.App., 352 N.E.2d 821 (1976); *Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp. 409 (N.D.Ohio E.Div.1976).

Affirmed as to Stay Wood Products, Inc.; reversed as to N. T. Slade.

Affirmed in part, reversed in part.

TODD, J., took no part in the consideration or decision of this case.

7. Minn.St. 336.2–201(1) provides in part: "Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made * * * and signed by the party against whom enforcement is sought or by his authorized agent or broker."

8. Minn.St. 336.2–201(3) provides in part: "A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable

"(a) if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made * * * a substantial beginning of their manufacture * * *."